**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| DISH TECHNOLOGIES L.L.C. and SLING TV L.L.C. <br><br> *Plaintiffs*, <br><br> v. <br><br> PELOTON INTERACTIVE, INC. <br><br> *Defendant*. | C.A. No. _____ <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs DISH Technologies L.L.C. and Sling TV L.L.C. (collectively, "DISH") allege against Defendant Peloton Interactive, Inc. ("Peloton") as follows:

**PARTIES**

1.      Plaintiff DISH Technologies L.L.C. is a limited liability company organized and existing under the laws of the State of Colorado, with its principal place of business at 9601 South Meridian Boulevard, Englewood, Colorado 80112.  It provides innovation and technology services and products to, among others, the DISH Network® satellite pay TV service operated by DISH Network L.L.C. and the Sling TV® streaming pay TV service operated by Sling TV L.L.C.

2.      Plaintiff Sling TV L.L.C. is a limited liability company organized and existing under the laws of the State of Colorado, with its principal place of business at 9601 South Meridian Boulevard, Englewood, Colorado 80112.  It operates the Sling TV® streaming pay TV service.

3.      On information and belief, Defendant Peloton Interactive, Inc. is a corporation existing under the laws of the State of Delaware, with its principal place of business at 125 West 25th Street, 11th Floor, New York, New York 10001.  On information and belief, Peloton Interactive,

Inc. operates online streaming services through its Peloton Application and Peloton Devices (e.g., Peloton Bike and Peloton Tread).  This Defendant has appointed Corporation Service Company at 251 Little Falls Drive, Wilmington DE 19808 as its agent for service of process.

## JURISDICTION AND VENUE

4.      DISH asserts a claim for patent infringement against Peloton arising under the patent laws of the United States, Title 35 of the United States Code.  Accordingly, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.      This Court has personal jurisdiction over Peloton for at least the following reasons: (1) Peloton has committed acts of patent infringement and contributed to and induced acts of patent infringement by others in this District; (2) Peloton regularly does business or solicits business in this District; (3) Peloton engages in other persistent courses of conduct and derives substantial revenue by its offering of infringing products and services and providing infringing products and services in this District; and (4) Peloton has purposefully established substantial, systematic, and continuous contacts with this District and should reasonably expect to be subject to suit here by its offering of infringing products and services and providing infringing products and services in this District.

6.      Peloton has been registered to do business in Texas since at least May 27, 2015, has been assigned Texas Taxpayer No. 32057346739, and has a Texas registered agent, Corporation Service Company dba CSC-Lawyers Incorporating Service Company, located at 211 East 7th Street, Suite 620, Austin, TX 78701.

7.      Peloton, directly and through subsidiaries or intermediaries (including distributors, retailers, and others), has purposefully and voluntarily placed its infringing products into this District and into the stream of commerce with the intention and expectation that the infringing

products will be purchased for use in this District.  Peloton has offered for sale and sold, and continues to offer for sale and sell, infringing products for delivery and use in this District.

8.     Venue is proper in the District of Texas under at least 28 U.S.C. §§ 1391(b), (c) and/or 1400(b) at least because, on information and belief, Peloton has committed acts of infringement in the State of Texas, including but not limited to offering products or services that infringe one or more of DISH's asserted patents to customers located in Texas and/or for use in Texas.

9.     Peloton has a regular and established places of business in this District because it has dedicated, physical places for its operations in this District.  On information and belief, Peloton has a second corporate headquarters, in Plano's Legacy Central development located at 6600 Chase Oaks Blvd., Plano, TX 75023.  *See* Complaint ¶¶ 7, 41, *Peloton Interactive, Inc. v. Flywheel Sports, Inc.*, No. 2-19-cv-00317 (E.D. Tex. Sept. 20, 2019); *see also* Exhibit 1 (stating that Peloton has "rented 27,518 square feet of office space" at Legacy Central for its "first member support center located outside of its New York City headquarters"). Peloton's second corporate headquarters is pictured below.



Peloton Head Quarters 2, 6600 Chase Oaks Blvd, Plano, TX 75023, GOOGLE MAPS, https://goo.gl/maps/fJUAzt7Xc4hzgDkQ8 (last visited on Dec. 2, 2020).  In December 2020, Peloton announced that it would be expanding its second corporate headquarters by 103,759 square feet of office space and up to 1,600 more jobs.  Exhibit 2; *see also* Exhibit 3 at 19 (stating that the lease term for the Plano corporate headquarters is extended through January 2029 and Peloton expects to begin preparing the additional square footage for use as an office facility on December 1, 2020).

10.     In addition to having a corporate headquarters in this judicial district, Peloton also has a showroom in Plano's Legacy West development located at 7500 Windrose Avenue, Plano, Texas 75024.  Complaint ¶ 7, *Peloton Interactive, Inc. v. Flywheel Sports, Inc.*, No. 2-19-cv-00317 (E.D.

Tex. Sept. 20, 2019); *see also* Exhibit 1 (stating that Peloton has "opened a new showroom at Legacy West in Plano"); Exhibit 4.  Peloton's Plano showroom is pictured below.



7500    Windrose    Ave    b165,    Plano,    TX    75024,    Google    Maps, https://goo.gl/maps/Enceoqvg9hMkyuPH8 (last visited on Dec. 2, 2020).

11.    Peloton has a regular and established place of business because, on information and belief, Peloton has employees and other agents regularly conducting business at its second corporate headquarters and showroom located in this District.  Exhibit 1 at 2 ("Peloton will hire up to 400 people to work in the Plano location"); Exhibit 4 (offering "a personalized walkthrough of the Peloton Bike or Tread by a dedicated sales associate" at the Plano Legacy West location).

12.    Peloton also has a regular and established place of business because Peloton's Plano corporate headquarters and Plano showroom are a place of Peloton.  On information and belief,

Peloton leases these places from the owners of Plano's Legacy Central and Legacy West developments and Peloton engages in business from these places.  Exhibit 1 (stating that Peloton has "rented 27,518 square feet of office space" at Legacy Central and has "opened a new showroom at Legacy West in Plano"); *see also* Exhibit 4.

## THE ABR PATENTS

13.    On August 2, 2016, the PTO duly and lawfully issued United States Patent No. 9,407,564 ("the '564 Patent"), entitled "Apparatus, system, and method for adaptive-rate shifting of streaming content."  A true and correct copy of the '564 Patent is attached as Exhibit A.  Subject to the exclusive license referenced below, all rights, title, and interest in and to the '564 Patent have been assigned to DISH Technologies L.L.C., which is the sole owner of the '564 Patent.

14.    On November 5, 2019, the PTO duly and lawfully issued United States Patent No. 10,469,554 ("the '554 Patent"), entitled "Apparatus, system, and method for multi-bitrate content streaming."  A true and correct copy of the '554 Patent is attached as Exhibit B.  Subject to the exclusive license referenced below, all rights, title, and interest in and to the '554 Patent have been assigned to DISH Technologies L.L.C., which is the sole owner of the '554 Patent.

15.    On November 5, 2019, the PTO duly and lawfully issued United States Patent No. 10,469,555 ("the '555 Patent"), entitled "Apparatus, system, and method for multi-bitrate content streaming."  A true and correct copy of the '555 Patent is attached as Exhibit C.  Subject to the exclusive license referenced below, all rights, title, and interest in and to the '555 Patent have been assigned to DISH Technologies L.L.C., which is the sole owner of the '555 Patent.

16.    On August 25, 2020, the PTO duly and lawfully issued United States Patent No. 10,757,156 ("the '156 Patent"), entitled "Apparatus, system, and method for adaptive-rate shifting of streaming content."  A true and correct copy of the '156 Patent is attached as Exhibit D.  Subject

to the exclusive license referenced below, all rights, title, and interest in and to the '156 Patent have been assigned to DISH Technologies L.L.C., which is the sole owner of the '156 Patent.

17.     On March 16, 2021, the PTO duly and lawfully issued United States Patent No. 10,951,680 ("the '680 Patent"), entitled "Apparatus, system, and method for multi-bitrate content streaming."  A true and correct copy of the '680 Patent is attached as Exhibit E.  Subject to the exclusive license referenced below, all rights, title, and interest in and to the '680 Patent have been assigned to DISH Technologies L.L.C., which is the sole owner of the '680 Patent.

18.     DISH Technologies has entered into an exclusive license with Sling TV L.L.C. granting substantial rights in the above-identified patents to Sling TV L.L.C., including the right to sue thereon.

19.     Certain of Sling TV L.L.C.'s products and services practice one or more of the Asserted Patents.  In compliance with 35 U.S.C. § 287(a), Sling TV L.L.C. marks its practicing products and requires its sublicensees to do the same.

20.     Additionally, certain products and services offered by DISH Technologies' affiliate DISH Network L.L.C. ("DISH Network") also practice the Asserted Patents.  DISH Network marks its practicing products and maintains a webpage identifying a listing of patents applicable to   DISH   Network's   products.   *See Intellectual Property*, DISH NETWORK, *https://www.dish.com/ip/* (last visited Feb. 23, 2021).

21.     The claimed inventions in these patents are directed to various novel aspects and improvements to adaptive bitrate streaming ("ABR") technology.  The '564, '554, '555, '156, and '680 Patents (collectively, "the ABR Patents") are currently in full force and effect.  The patent applications underlying the '564 and '156 Patents are continuations of U.S. Patent Application No.

11/116,783.  Each of the '554, '555, and '680 Patents issued from patent applications that are continuations-in-part of U.S. Patent Application No. 11/116,783.

## BACKGROUND OF THE DISPUTE

### MOVE IS A PIONEER OF ADAPTIVE BITRATE TECHNOLOGY

22.     MOVE Networks, Inc. ("MOVE") was the original owner of the ABR Patents.  MOVE invented and patented HTTP-based Adaptive Bitrate Streaming to improve the quality of streamed video content over the Internet.  While at MOVE, inventors Drew Major, Mark Hurst, and later, David Brueck, (collectively, "the ABR Inventors") observed that the Internet was fast becoming a preferred method for distributing live and recorded video to individuals even though content delivery over the Internet at the time was notoriously unreliable, expensive and inferior in quality compared to cable- and satellite-delivered content.  To access video content online, users were left with two mediocre choices: (1) waiting for their content to download (which did not support immediate viewing of live content and often required the user to select the quality desired: LOW, MEDIUM, or HIGH, which in turn determined how long the user had to wait before viewing); or (2) streaming live or recorded content, which often was unreliable (pausing to "buffer") or only worked at low-resolution.

23.     The ABR Inventors knew that media streaming had not reached its full potential and that, through research and improvement, it was possible that streaming could rival the quality of cable and satellite delivered content.  The state-of-the-art, though, was unacceptable prior to the inventions disclosed in the patents-in-suit.  Often during playback, the streaming technologies did a poor job selecting the video quality / resolution that the network bandwidth and reliability could support.  Most commercial systems, from companies like RealNetworks, Adobe, Microsoft, or Apple, were proprietary implementations based on public Internet standards (RTP/RTSP).

Common standards notwithstanding, the proprietary implementations were mutually incompatible. They were expensive to deploy by the Content Delivery Networks ("CDNs") and required many servers to scale to a large number of viewers.  In addition, these technologies often required custom server architectures and routing IT configurations to penetrate Internet firewalls.  The ABR Inventors recognized these shortcomings as an opportunity and developed a better solution.

24.     The ABR Patents' specifications detail the need for improved data transport in content streaming.  Users will generally choose streaming over downloading because "they tend to want to see or hear the media files instantaneously." *See, e.g.*, '564 Patent, Exhibit A, at col. 1, ll. 49–51.  Unfortunately for protocols at the time, "[s]treaming offers the advantage of immediate access to the content but currently sacrifices quality compared with downloading a file of the same content." *See, e.g., id*. col. 1, ll. 52–54.  The ABR Inventors observed that "a need exists for an [invention] that alleviates the problems of reliability, efficiency, and latency" encountered in currently available content streaming systems. *See, e.g.*, *id.* col. 2, ll. 39-41.

25.     To address these needs, the ABR Inventors came up with a novel solution:  HTTP-based Adaptive Bitrate Streaming.  ABR segments the full content file into smaller units ("streamlets") in multiple bitrates and delivers them over HTTP / TCP, the underlying protocols used for reliably transmitting data over the Internet.  The ABR Inventors' approach enables content delivery to adapt to the bandwidth available at any particular time, ensuring delivery of the highest possible quality content throughout the course of the stream.  The playback client device continuously observes the quality of a user's network connection and adjusts the requested quality of the streamed content.  The other RTP/RTSP-based technologies used a client / server architecture, where the server determined the bitrate to send to the client.  The other technologies also did not segment the content, usually delivering it as a continuous stream of bits or as a single

large file.  Segmenting the content allows the playback device to easily change bitrates.  The result is that today, MOVE's patented ABR technology allows Internet users to stream content from across the world in real time at the highest possible quality.

26.     The ABR Patents' specifications describe how the MOVE inventors significantly improved the functionality of computer devices used to stream content data over a network: "[A] need exists for an apparatus, system, and method that alleviate the problems of reliability, efficiency, and latency [during data transport streaming over a network].  Additionally, such an apparatus, system, and method would offer instantaneous viewing along with the ability to fast forward, rewind, direct seek, and browse multiple streams."  *See, e.g.*, id. col. 2, ll. 39–44.  The claims of the ABR Patents embody these improvements by providing a particular solution to these problems.  The ABR Patents' specifications explain that "[t]he present invention has been developed in response to the present state of the art, and in particular, in response to the problems and needs in the art that have not yet been fully solved by currently available content streaming systems."  *See, e.g.*, *id*. col. 2, ll. 52-55.  Thus, the specifications explain "the present invention has been developed to provide an apparatus, system, and method for adaptive-rate content streaming that overcome many or all of the above-discussed shortcomings in the art."  *See, e.g.*, *id*. col. 2, ll. 56-59.  The claims of the ABR Patents include numerous unconventional and revolutionary elements that, taken as a whole, provide this solution that improves the functionality of computer devices used to stream content data over a network.

27.     One unconventional but fundamental improvement found in the claims of the ABR Patents is the creation of sets of streamlets from the original large content file, where a plurality of streamlets in each set are aligned by starting time and duration (typically a few seconds) but have different bitrates.  By segmenting and then encoding the streamlets, the claims of the ABR Patent

allow for contiguous playback of the streamlets that independently yields playback of the full content.  The common alignment of the streamlets in each set allows a playback device to select one quality of streamlet from a particular set, and, as needed to adjust for changing bandwidth resources, to select a different quality of streamlet from the subsequent set.  When the bandwidth of the user's network is constrained, the client can select a lower bitrate to maintain playback continuity instead of "buffering."  By using streamlets, the claims of the ABR Patents eliminate the need for users to download the full content file before beginning playback, thereby offering instantaneous viewing along with the ability to fast forward, rewind, direct seek, and browse multiple streams.  Additionally, segmenting the media into streamlets as required by the claims of the ABR Patents enables users to retrieve and enjoy content at the most appropriate bitrate possible as the media is streamed, thereby reducing latency and improving the reliability and efficiency of computer devices used to stream content data over a network.  It is also well suited for live stream playback.

28.     Another non-routine and revolutionary improvement found in the claims of the ABR Patents is that the client controls switching between different bitrates.  The benefits of using an intelligent client to make the decisions and switch between different bitrate streamlets are two-fold.  First, the claims of the ABR Patents reduce latency and improve the efficiency of computer devices used to stream content data over a network because the client is in a better position to determine the appropriate streamlet by measuring the actual throughput of the network at its point of reception.  Second, the claims of the ABR Patents improve the reliability and efficiency of computer devices used to stream content data over a network because moving the decision-making to the client effectively eliminates the need for a customized video server.  Instead, a standard web server can be employed to host all the content's streamlets.  Streamlets may be requested by a

client using the standard HTTP/TCP protocol—the web standard upon which the Internet is built. Shifting control of switching between different bitrates to the clients allows for access to the segmented content that can be scaled exponentially through the use of standardized web caches. These benefits also allow for a vast reduction in operating and publishing costs.  Thus, the claims of the ABR Patents provide a reliable and efficient solution that improves the functioning of computer devices used to stream content data while reducing overall latency and network congestion.

29.     The ABR Inventors' improvements to streaming succeeded where others tried and failed.  During the late 1990s, established streaming companies, including RealNetworks, Adobe, Microsoft, and Apple, separately attempted to develop a successful multiple bitrate streaming platform by using proprietary implementations of the RTP/RTSP standards.  None of these systems succeeded at making bitrate switching consistent and none actually worked over the Internet.

30.     The unconventional and revolutionary improvements embodied by the claims of the ABR Patents were also recognized by numerous industry leaders and commentators.  For example, Forbes explained that Move Networks was "at the forefront of [the] next evolution" of media streaming.  Exhibit 5.  Forbes explained that the technology covered by the ABR Patents "breaks up the video into bits and efficiently reorganizes them over the network so there's no need for the special computer servers and dedicated transmission lines."  Id.  Move Networks was identified as a member of the Red Herring 100 in 2007.  Exhibit 6.  Industry leaders "have regarded the Red Herring 100 lists as an invaluable instrument to discover and advocate the promising startups that will lead the next wave of disruption and innovation."  Exhibit 7.  Similarly, Move Networks was also named as a member of the OnHollywood 100 in 2007.  Exhibit 8.  The list is curated by AlwaysOn to "introduce a new generation of game-changing players in the digital entertainment

space." *Id*.  Move Networks was also nominated as a finalist in the 2007 Crunchies for the "Best Technology Innovation / Achievement" category by GigaOm, Read/WriteWeb, VentureBeat, and TechCrunch.  Exhibit 9.

### ABR PATENTS SELL FOR $45 MILLION

31.     In December of 2010, EchoStar Advanced Technologies L.L.C., then a wholly owned subsidiary of EchoStar Corporation, spent $45 million to acquire MOVE and its ABR Patent portfolio.  Recognizing the ingenuity of MOVE's ABR technology and the value-added for its customers and their increasing interest in quality online content delivery, DISH affiliate DISH Digital Holding L.L.C. acquired EchoStar Advanced Technologies L.L.C. in connection with a joint venture with EchoStar Corporation in 2012.  EchoStar Advanced Technologies L.L.C., which was later renamed DISH Digital L.L.C., transferred the ABR Patents to EchoStar Technologies L.L.C. (a subsidiary of EchoStar Corporation) in 2014.  In February 2017, EchoStar Technologies L.L.C. became a subsidiary of DISH Network L.L.C., and in February 2018, was renamed DISH Technologies L.L.C.

32.     DISH and its affiliated companies are a leading provider of Internet streaming services. It is a leading investor and innovator in infrastructure and technologies that will meet the personalized needs of its increasingly diverse pool of customers.  Since its founding, DISH and its affiliated companies have invested millions in research and development and acquisition of novel technologies that will resolve long-felt problems and needs across its industry.

33.     As the public continues to increasingly rely on the Internet for its informational and entertainment needs, one such problem into which DISH and its affiliated companies have dedicated great time and resources is improving the quality of streaming media.  The specific entities that implement and own the technology covered by MOVE's patent portfolio have

undergone significant evolution as these entities continue to improve upon ABR and advance reliable delivery of high-resolution content over the Internet.

34.     DISH's recent investments in ABR have already proven a success.  Sling TV L.L.C. is DISH and its affiliated companies' main Internet-delivered content provider, offering programming to numerous Internet streaming devices.  Since the launch of Sling TV in the beginning of 2015, Sling TV has grown to over 2.474 million subscribers, who are now receiving a live TV video experience comparable to cable or satellite.

**PELOTON'S PRODUCTS AND SERVICES INFRINGE THE ABR PATENTS**

35.     Peloton has been and is now directly infringing and/or indirectly infringing the ABR Patents.

36.     On information and belief, Peloton is a distributor of live and on-demand content via the Internet.  Exhibit 3 at 11.  Peloton makes, uses, sells, and offers for sale in the United States products and services that infringe the ABR Patents, and continues to do so.  These infringing products and services include online streaming services operated by Peloton Interactive, Inc. including, the Peloton Application and Peloton Devices (e.g., the Peloton Bike and Peloton Tread) (collectively, "the Accused Streaming Services").  *Id.*

37.     The Accused Streaming Services are defined by an integrated experience of hardware, software, and content.  For example, a Peloton document states that "[w]hile we use the word bike freely, the 'the [sic] Peloton Bike' is actually defined by the integrated experience of hardware software and content.  Need to ensure we don't draw focus to the hardware only."  Exhibit 10 at 5.

38.     Peloton's use of state-of-the-art streaming technology has established Peloton as "premium brand."  For example, a Peloton document states that "Peloton has established itself as

a premium brand through design and performance excellence.  Some proof points include: … (2) state of the art streaming technology."  Exhibit 11 at 21.

39.    Streaming technology is at the core of the Peloton experience.  In an interview with Sarah Lacy of Startups.com, Peloton's Chief Technology Officer, Yony Feng, stated that:

> *Streaming is the core experience. The worst thing we can do is have an interruption to the experience of riding. Over the past year and half what we started building is a system where the table is sending anonymous metrics to us, such as, out of the last thirty seconds how did you buffer and how did you not buffer? The question we always want to know the answer to is: First, is every one of our users experiencing a streaming problem now? If so then the studio has a problem and it's impacting the user base worldwide.*
>
> *In a lot of cases streaming problems are a combination with some of the set ups people have. Think about the bike. It isn't necessarily in the same location as your AppleTV, which is usually right next to the router or modem.  There's a combination of wifi density and fdistance from the router. We are looking at ways to long term solve that problem, maybe through a more powerful antenna.*

Exhibit 12 at 6-7 (Streaming the Future of Fitness Interview with Yony Feng) (available at https://www.startups.com/library/founder-stories/yony-feng).

40.    On information and belief, the Accused Streaming Services provide "connected, technology-enabled fitness" and "the streaming of immersive, instructor-led boutique classes." Exhibit 3 at 9.  Here is an example of a live streamed fitness class using the Peloton Bike platform:



## CLAIMS FOR RELIEF
## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 9,407,564

### DIRECT INFRINGEMENT

41.     DISH re-alleges and incorporates herein by reference the allegations contained in

Paragraphs 1–40 of the Complaint as if fully set forth herein.

42.     On information and belief, Peloton directly infringes, literally and/or under the doctrine

of equivalents, at least claim 8 of the '564 Patent, which recites:

> A method executable by an end user station to present rate-adaptive streams
> received via at least one transmission control protocol (TCP) connection with a
> server over a network, the method comprising;
>
> streaming, by a media player operating on the end user station, a video from the
> server via the at least one TCP connection over the network, wherein multiple
> different copies of the video encoded at different bit rates are stored as multiple sets
> of files on the server, wherein each of the files yields a different portion of the video
> on playback, wherein the files across the different copies yield the same portions of
> the video on playback, and wherein each of the files comprises a time index such
> that the files whose playback is the same portion of the video for each of the

different copies have the same time index in relation to the beginning of the video, and wherein the streaming comprises:

requesting by the media player a plurality of sequential files of one of the copies from the server based on the time indexes;

automatically requesting by the media player from the server subsequent portions of the video by requesting for each such portion one of the files from one of the copies dependent upon successive determinations by the media player to shift the playback quality to a higher or lower quality one of the different copies, the automatically requesting including repeatedly generating a factor indicative of the current ability to sustain the streaming of the video using the files from different ones of the copies, wherein the factor relates to the performance of the network; and

making the successive determinations to shift the playback quality based on the factor to achieve continuous playback of the video using the files of the highest quality one of the copies determined sustainable at that time, wherein the making the successive determinations to shift comprises upshifting to a higher quality one of the different copies when the at least one factor is greater than a first threshold and downshifting to a lower quality one of the different copies when the at least one factor is less than a second threshold; and

presenting the video by playing back the requested media files with the media player on the end user station in order of ascending playback time.

43.     The Accused Streaming Services receive segments of a selected video program for playback of programming over a network connection.  The Accused Streaming Services adapt requests for segments from a set of segments with the same content but varying quality based upon the quality of the network connection.  Exhibit A-1 to this Complaint is a claim chart with a more detailed infringement analysis of the Accused Streaming Services.[1]

44.     On information and belief, Peloton possesses knowledge of, and is aware of, the '564 Patent, or became aware of this patent at the time of filing this lawsuit.

---

1.  DISH notes that Exhibit A-1 and Exhibits B-1, C-1, D-1, and E-1, *see infra*, are based exclusively on publicly available information, and without the benefit of any Court claim construction.  Accordingly, for each Count below, DISH reserves the right to supplement, amend or modify the analysis as warranted in light of additional facts, claim construction, or other developments.

45.     Peloton's acts of infringement have injured and damaged DISH and will continue to injure and damage DISH.

46.     Peloton's actions have caused DISH to suffer irreparable harm resulting from the loss of its lawful patent rights and the loss of its ability to exclude others from the market.  Upon information and belief, Peloton will continue these infringing acts unless enjoined by this court.

## INDIRECT INFRINGEMENT

47.     DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–46 of the Complaint as if fully set forth herein.

48.     On information and belief, Peloton indirectly infringes, literally and/or under the doctrine of equivalents, at least claim 8 of the '564 Patent, which recites:

> A method executable by an end user station to present rate-adaptive streams received via at least one transmission control protocol (TCP) connection with a server over a network, the method comprising;
>
> streaming, by a media player operating on the end user station, a video from the server via the at least one TCP connection over the network, wherein multiple different copies of the video encoded at different bit rates are stored as multiple sets of files on the server, wherein each of the files yields a different portion of the video on playback, wherein the files across the different copies yield the same portions of the video on playback, and wherein each of the files comprises a time index such that the files whose playback is the same portion of the video for each of the different copies have the same time index in relation to the beginning of the video, and wherein the streaming comprises:
>
> requesting by the media player a plurality of sequential files of one of the copies from the server based on the time indexes;
>
> automatically requesting by the media player from the server subsequent portions of the video by requesting for each such portion one of the files from one of the copies dependent upon successive determinations by the media player to shift the playback quality to a higher or lower quality one of the different copies, the automatically requesting including repeatedly generating a factor indicative of the current ability to sustain the streaming of the video using the files from different ones of the copies, wherein the factor relates to the performance of the network; and

making the successive determinations to shift the playback quality based on the factor to achieve continuous playback of the video using the files of the highest quality one of the copies determined sustainable at that time, wherein the making the successive determinations to shift comprises upshifting to a higher quality one of the different copies when the at least one factor is greater than a first threshold and downshifting to a lower quality one of the different copies when the at least one factor is less than a second threshold; and

presenting the video by playing back the requested media files with the media player on the end user station in order of ascending playback time.

49.     The Accused Streaming Services receive segments of a selected video program for playback of programming over a network connection.  The Accused Streaming Services adapt requests for segments from a set of segments with the same content but varying quality based upon the quality of the network connection.  Exhibit A-1 to this Complaint is a claim chart with a more detailed infringement analysis of the Accused Streaming Services.

## INDIRECT INFRINGEMENT BY INDUCEMENT

50.     DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–49 of the Complaint as if fully set forth herein.

51.     On information and belief, Peloton is liable for inducing infringement of the '564 Patent under 35 U.S.C. § 271(b) by having knowledge of the '564 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '564 Patent, with specific intent, by its customers.

52.     Specifically, Peloton actively induces infringement of the '564 Patent by, *inter alia*, training its customers on the use of the Accused Streaming Services and/or promotion and/or sales of the Accused Streaming Services to Peloton's customers including, but not limited to, end-users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms for implementing adaptive-rate content streaming as claimed in the '564 Patent.

53. Peloton's customers for the Accused Streaming Services directly infringe the '564 Patent by making, using, selling, and/or offering for sale the Accused Streaming Services.

54. For example, Peloton actively induces infringement of the '564 Patent, because Peloton has knowledge that end users of the Accused Streaming Services including, but not limited to, users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms, use Peloton's infringing Accused Streaming Services in the United States, and because Peloton encourages such acts resulting in direct patent infringement, by, *inter alia*, training, promotion, and/or sales of the Accused Streaming Services to Peloton customers including, but not limited to, end-users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms for their use of adaptive-rate content streaming as claimed in the '564 Patent. *See, e.g.*, Exhibit 13 (answering questions such as, "Which Fire TV models are compatible with the Peloton App?" and "Will I be able to cast a class from my Peloton Bike, Tread or iOS/Android app to my Fire TV?") (last visited September 4, 2020).

55. On information and belief, Peloton intends to, and continues to intend to, indirectly infringe the '564 Patent through inducement of the sale and use of the Accused Streaming Services.

56. Adaptive bitrate streaming is a well-defined field of technology with only a few major developers, including Apple, Microsoft, Adobe and DISH since its acquisition and continuing development of MOVE's patent portfolio.  On information and belief, as a provider of streamed content, Peloton would have monitored developments relating to adaptive-rate content streaming technology, including DISH's ABR technology, and knew, or at the very least, should have known, about the issuance of the '564 Patent.

57. On information and belief, despite knowing that its actions constituted induced infringement of the '564 Patent and/or despite knowing that there was a high likelihood that its

actions constituted induced infringement of the patent, Peloton nevertheless continued its infringing actions, and continues to make, use, and sell, the Accused Streaming Services.

58.     Peloton continues to provide the Accused Streaming Services with full knowledge and disregard of the ABR Patents, including the '564 Patent.

59.     Peloton's acts of induced infringement have injured and damaged DISH and will continue to injure and damage DISH.

60.     Peloton's actions have caused DISH to suffer irreparable harm resulting from the loss of its lawful patent rights and the loss of its ability to exclude others from the market.  Upon information and belief, Peloton will continue these infringing acts unless enjoined by this Court.

**INDIRECT INFRINGEMENT BY CONTRIBUTORY INFRINGEMENT**

61.     DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–60 of the Complaint as if fully set forth herein.

62.     Peloton is liable for contributory infringement of the '564 Patent under 35 U.S.C § 271(c) by having sold or offered to sell, and continuing to sell or offer for sale the Accused Streaming Services within the United States because the Accused Streaming Services constitute a material part of the invention embodied in the '564 Patent, which Peloton knows to be especially made and/or especially adapted for use in infringement of the '564 Patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

63.     On information and belief, Peloton is liable for contributory infringement by having knowledge of the '564 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '564 Patent by its customers, including users and subscribers, who use the Accused Streaming Services.

64.     Specifically, Peloton contributes to infringement of the '564 Patent by, *inter alia*, promotion, and/or sales of the infringing Accused Streaming Services to Peloton's customers, including users and subscribers, for their use of adaptive-rate content streaming as claimed in the '564 Patent.  Those customers directly infringe the '564 Patent by using the Accused Streaming Services.

65.     For example, Peloton is liable for contributory infringement by knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, Peloton customers, including users and subscribers, to directly infringe the '564 Patent by using the Accused Streaming Services in the United States.

66.     Adaptive bitrate streaming is a well-defined field of technology with only a few major developers, including Apple, Microsoft, Adobe and DISH since its acquisition and continuing development of MOVE's patent portfolio.  On information and belief, as a provider of streamed content, Peloton would have monitored developments relating to adaptive-rate content streaming technology, including DISH's ABR technology, and knew, or at the very least, should have known, about the issuance of the '564 Patent and that the Accused Streaming Services were especially made and/or especially adapted for use in infringement of the '564 Patent and were not a staple article or commodity of commerce suitable for substantial non-infringing use.

67.     Peloton continues to provide the Accused Streaming Services with full knowledge and disregard of the ABR Patents, including the '564 Patent.

68.     Peloton's past and ongoing infringement of the '564 Patent has and will continue to irreparably harm DISH.

69.     Peloton's past and ongoing infringement of the '564 Patent has and will continue to cause DISH damages.

70.     DISH is asserting claims 1 and 8 of the '564 Patent and some or all of the dependents to those claims.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 10,469,554
### DIRECT INFRINGEMENT

71.     DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–70 of the Complaint as if fully set forth herein.

72.     On information and belief, Peloton directly infringes, literally and/or under the doctrine of equivalents, at least claim 16 of the '554 Patent, which recites:

> An end user station to stream a live event video over a network from a server for playback of the video, the content player device comprising:
>
> a processor;
>
> a digital processing apparatus memory device comprising non-transitory machine-readable instructions that, when executed, cause the processor to:
>
> establish one or more network connections between the end user station and the server, wherein the server is configured to access at least one of a plurality of groups of streamlets;
>
> wherein the live event video is encoded at a plurality of different bitrates to create a plurality of streams including at least a low quality stream, a medium quality stream, and a high quality stream, each of the low quality stream, the medium quality stream, and the high quality stream comprising a group of streamlets encoded at the same respective one of the different bitrates, each group comprising at least first and second streamlets, each of the streamlets corresponding to a portion of the live event video;
>
> wherein at least one of the low quality stream, the medium quality stream, and the high quality stream is encoded at a bit rate of no less than 600 kbps; and
>
> wherein the first streamlets of each of the low quality stream, the medium quality stream and the high quality stream each has an equal playback duration and each of the first streamlets encodes the same portion of the live event video at a different one of the different bitrates;
>
> select a specific one of the low quality stream, the medium quality stream, and the high quality stream based upon a determination by the end user station to select a higher or lower bitrate version of the streams;

place a streamlet request to the server over the one or more network connections for the first streamlet of the selected stream;

receive the requested first streamlet from the server via the one or more network connections; and

provide the received first streamlet for playback of the live event video.

73.     The Accused Streaming Services receive segments of a selected video program for playback of programming over a network connection.  The Accused Streaming Services adapt requests for segments from a set of segments with the same content but varying quality based upon the quality of the network connection.  Exhibit B-1 to this Complaint is a claim chart with a more detailed infringement analysis of the Accused Streaming Services.[2]

74.     On information and belief, Peloton possesses knowledge of, and is aware of, the '554 Patent, or became aware of this patent at the time of filing this lawsuit.

75.     Peloton's acts of infringement have injured and damaged DISH and will continue to injure and damage DISH.

76.     Peloton's actions have caused DISH to suffer irreparable harm resulting from the loss of its lawful patent rights and the loss of its ability to exclude others from the market.  Upon information and belief, Peloton will continue these infringing acts unless enjoined by this court.

---

2.  DISH notes that Exhibit B-1, Exhibit A-1, *see supra* and Exhibits C-1, D-1, and E-1, *see infra*, are based exclusively on publicly available information, and without the benefit of any Court claim construction.  Accordingly, for each Count below, DISH reserves the right to supplement, amend or modify the analysis as warranted in light of additional facts, claim construction, or other developments.

## INDIRECT INFRINGEMENT

77.    DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–76 of the Complaint as if fully set forth herein.

78.    On information and belief, Peloton indirectly infringes, literally and/or under the doctrine of equivalents, at least claim 16 of the '554 Patent, which recites:

> An end user station to stream a live event video over a network from a server for playback of the video, the content player device comprising:
>
> a processor;
>
> a digital processing apparatus memory device comprising non-transitory machine-readable instructions that, when executed, cause the processor to:
>
> establish one or more network connections between the end user station and the server, wherein the server is configured to access at least one of a plurality of groups of streamlets;
>
> wherein the live event video is encoded at a plurality of different bitrates to create a plurality of streams including at least a low quality stream, a medium quality stream, and a high quality stream, each of the low quality stream, the medium quality stream, and the high quality stream comprising a group of streamlets encoded at the same respective one of the different bitrates, each group comprising at least first and second streamlets, each of the streamlets corresponding to a portion of the live event video;
>
> wherein at least one of the low quality stream, the medium quality stream, and the high quality stream is encoded at a bit rate of no less than 600 kbps; and
>
> wherein the first streamlets of each of the low quality stream, the medium quality stream and the high quality stream each has an equal playback duration and each of the first streamlets encodes the same portion of the live event video at a different one of the different bitrates;
>
> select a specific one of the low quality stream, the medium quality stream, and the high quality stream based upon a determination by the end user station to select a higher or lower bitrate version of the streams;
>
> place a streamlet request to the server over the one or more network connections for the first streamlet of the selected stream;
>
> receive the requested first streamlet from the server via the one or more network connections; and

provide the received first streamlet for playback of the live event video.

79.     The Accused Streaming Services receive segments of a selected video program for playback of programming over a network connection.  The Accused Streaming Services adapt requests for segments from a set of segments with the same content but varying quality based upon the quality of the network connection.  Exhibit B-1 to this Complaint is a claim chart with a more detailed infringement analysis of the Accused Streaming Services.

## INDIRECT INFRINGEMENT BY INDUCEMENT

80.     DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–79 of the Complaint as if fully set forth herein.

81.     On information and belief, Peloton is liable for inducing infringement of the '554 Patent under 35 U.S.C. § 271(b) by having knowledge of the '554 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '554 Patent, with specific intent, by its customers.

82.     Specifically, Peloton actively induces infringement of the '554 Patent by, *inter alia*, training its customers on the use of the Accused Streaming Services and/or promotion and/or sales of the Accused Streaming Services to Peloton's customers including, but not limited to, end-users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms for implementing adaptive-rate content streaming as claimed in the '554 Patent.

83.     Peloton's customers for the Accused Streaming Services directly infringe the '554 Patent by making, using, selling, and/or offering for sale the Accused Streaming Services.

84.     For example, Peloton actively induces infringement of the '554 Patent, because Peloton has knowledge that end users of the Accused Streaming Services including, but not limited to, users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms, use Peloton's infringing Accused Streaming Services in the United States, and

because Peloton encourages such acts resulting in direct patent infringement, by, *inter alia*, training, promotion, and/or sales of the Accused Streaming Services to Peloton customers including, but not limited to, end-users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms for their use of adaptive-rate content streaming as claimed in the '554 Patent. *See, e.g.*, Exhibit 13 (answering questions such as, "Which Fire TV models are compatible with the Peloton App?" and "Will I be able to cast a class from my Peloton Bike, Tread or iOS/Android app to my Fire TV?") (last visited September 4, 2020).

85.    On information and belief, Peloton intends to, and continues to intend to, indirectly infringe the '554 Patent through inducement of the sale and use of the Accused Streaming Services.

86.    Adaptive bitrate streaming is a well-defined field of technology with only a few major developers, including Apple, Microsoft, Adobe and DISH since its acquisition and continuing development of MOVE's patent portfolio.  On information and belief, as a provider of streamed content, Peloton would have monitored developments relating to adaptive-rate content streaming technology, including DISH's ABR technology, and knew, or at the very least, should have known, about the issuance of the '554 Patent.

87.    On information and belief, despite knowing that its actions constituted induced infringement of the '554 Patent and/or despite knowing that there was a high likelihood that its actions constituted induced infringement of the patent, Peloton nevertheless continued its infringing actions, and continues to make, use, and sell, the Accused Streaming Services.

88.    Peloton continues to provide the Accused Streaming Services with full knowledge and disregard of the ABR Patents, including the '554 Patent.

89.    Peloton's acts of induced infringement have injured and damaged DISH and will continue to injure and damage DISH.

90.     Peloton's actions have caused DISH to suffer irreparable harm resulting from the loss of its lawful patent rights and the loss of its ability to exclude others from the market.  Upon information and belief, Peloton will continue these infringing acts unless enjoined by this Court.

## INDIRECT INFRINGEMENT BY CONTRIBUTORY INFRINGEMENT

91.     DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–90 of the Complaint as if fully set forth herein.

92.     Peloton is liable for contributory infringement of the '554 Patent under 35 U.S.C § 271(c) by having sold or offered to sell, and continuing to sell or offer for sale the Accused Streaming Services within the United States because the Accused Streaming Services constitute a material part of the invention embodied in the '554 Patent, which Peloton knows to be especially made and/or especially adapted for use in infringement of the '554 Patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

93.     On information and belief, Peloton is liable for contributory infringement by having knowledge of the '554 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '554 Patent by its customers, including users and subscribers, who use the Accused Streaming Services.

94.     Specifically, Peloton contributes to infringement of the '554 Patent by, *inter alia*, promotion, and/or sales of the infringing Accused Streaming Services to Peloton's customers, including users and subscribers, for their use of adaptive-rate content streaming as claimed in the '554 Patent.  Those customers directly infringe the '554 Patent by using the Accused Streaming Services.

95.     For example, Peloton is liable for contributory infringement by knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, Peloton customers,

including users and subscribers, to directly infringe the '554 Patent by using the Accused Streaming Services in the United States.

96.    Adaptive bitrate streaming is a well-defined field of technology with only a few major developers, including Apple, Microsoft, Adobe and DISH since its acquisition and continuing development of MOVE's patent portfolio.  On information and belief, as a provider of streamed content, Peloton would have monitored developments relating to adaptive-rate content streaming technology, including DISH's ABR technology, and knew, or at the very least, should have known, about the issuance of the '554 Patent and that the Accused Streaming Services were especially made and/or especially adapted for use in infringement of the '554 Patent and were not a staple article or commodity of commerce suitable for substantial non-infringing use.

97.    Peloton continues to provide the Accused Streaming Services with full knowledge and disregard of the ABR Patents, including the '554 Patent.

98.    Peloton's past and ongoing infringement of the '554 Patent has and will continue to irreparably harm DISH.

99.    Peloton's past and ongoing infringement of the '554 Patent has and will continue to cause DISH damages.

100.    DISH is asserting claims 16 and 30 of the '554 Patent and some or all of the dependents to those claims.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 10,469,555

### DIRECT INFRINGEMENT

101.    DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–100 of the Complaint as if fully set forth herein.

102.     On information and belief, Peloton directly infringes, literally and/or under the doctrine of equivalents, at least claim 10 of the '555 Patent, which recites:

> A content player device to stream a video over a network from a server for playback of the video, the content player device comprising:
>
> a processor;
>
> a digital processing apparatus memory device comprising non-transitory machine-readable instructions that, when executed, cause the processor to:
>
> establish one or more network connections between the client module and the server, wherein the server is configured to access at least one of a plurality of groups of streamlets;
>
> wherein the video is encoded at a plurality of different bitrates to create a plurality of streams including at least a low quality stream, a medium quality stream, and a high quality stream, wherein each of the low quality stream, the medium quality stream, and the high quality stream comprises a streamlet that encodes the same portion of the video at a different one of the plurality of different bitrates;
>
> wherein at least one of the low quality stream, medium quality stream, and high quality stream is encoded at a bit rate of no less than 600 kbps; and
>
> wherein the streamlet encoding the same portion of the video in the low quality stream has an equal playback duration as the streamlet encoding the same portion of the video in the high quality stream;
>
> select a specific one of the streams based upon a determination by the client module to select a higher or lower bitrate version of the streams;
>
> place a streamlet request to the server over the one or more network connections for the selected stream;
>
> receive the requested streamlets from the server via the one or more network connections; and
>
> provide the received streamlets for playback of the video.

103.     The Accused Streaming Services receive segments of a selected video program for playback of programming over a network connection.  The Accused Streaming Services adapt requests for segments from a set of segments with the same content but varying quality based upon

the quality of the network connection.  Exhibit C-1 to this Complaint is a claim chart with a more detailed infringement analysis of the Accused Streaming Services.[3]

104.    On information and belief, Peloton possesses knowledge of, and is aware of, the '555 Patent, or became aware of this patent at the time of filing this lawsuit.

105.    Peloton's acts of infringement have injured and damaged DISH and will continue to injure and damage DISH.

106.    Peloton's actions have caused DISH to suffer irreparable harm resulting from the loss of its lawful patent rights and the loss of its ability to exclude others from the market.  Upon information and belief, Peloton will continue these infringing acts unless enjoined by this court.

## INDIRECT INFRINGEMENT

107.    DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–106 of the Complaint as if fully set forth herein.

108.    On information and belief, Peloton indirectly infringes, literally and/or under the doctrine of equivalents, at least claim 10 of the '555 Patent, which recites:

> A content player device to stream a video over a network from a server for playback of the video, the content player device comprising:
>
> a processor;
>
> a digital processing apparatus memory device comprising non-transitory machine-readable instructions that, when executed, cause the processor to:
>
> establish one or more network connections between the client module and the server, wherein the server is configured to access at least one of a plurality of groups of streamlets;

---

3.  DISH notes that Exhibit C-1,  Exhibits A-1 and B-1, *see supra*, and Exhibits D-1, and E-1, *see infra*, are based exclusively on publicly available information, and without the benefit of any Court claim construction.  Accordingly, for each Count below, DISH reserves the right to supplement, amend or modify the analysis as warranted in light of additional facts, claim construction, or other developments.

wherein the video is encoded at a plurality of different bitrates to create a plurality of streams including at least a low quality stream, a medium quality stream, and a high quality stream, wherein each of the low quality stream, the medium quality stream, and the high quality stream comprises a streamlet that encodes the same portion of the video at a different one of the plurality of different bitrates;

wherein at least one of the low quality stream, medium quality stream, and high quality stream is encoded at a bit rate of no less than 600 kbps; and

wherein the streamlet encoding the same portion of the video in the low quality stream has an equal playback duration as the streamlet encoding the same portion of the video in the high quality stream;

select a specific one of the streams based upon a determination by the client module to select a higher or lower bitrate version of the streams;

place a streamlet request to the server over the one or more network connections for the selected stream;

receive the requested streamlets from the server via the one or more network connections; and

provide the received streamlets for playback of the video.

109.    The Accused Streaming Services receive segments of a selected video program for playback of programming over a network connection.  The Accused Streaming Services adapt requests for segments from a set of segments with the same content but varying quality based upon the quality of the network connection.  Exhibit C-1 to this Complaint is a claim chart with a more detailed infringement analysis of the Accused Streaming Services.

### INDIRECT INFRINGEMENT BY INDUCEMENT

110.    DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–109 of the Complaint as if fully set forth herein.

111.    On information and belief, Peloton is liable for inducing infringement of the '555 Patent under 35 U.S.C. § 271(b) by having knowledge of the '555 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '555 Patent, with specific intent, by its customers.

112.    Specifically, Peloton actively induces infringement of the '555 Patent by, *inter alia*, training its customers on the use of the Accused Streaming Services and/or promotion and/or sales of the Accused Streaming Services to Peloton's customers including, but not limited to, end-users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms for implementing adaptive-rate content streaming as claimed in the '555 Patent.

113.    Peloton's customers for the Accused Streaming Services directly infringe the '555 Patent by making, using, selling, and/or offering for sale the Accused Streaming Services.

114.    For example, Peloton actively induces infringement of the '555 Patent, because Peloton has knowledge that end users of the Accused Streaming Services including, but not limited to, users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms, use Peloton's infringing Accused Streaming Services in the United States, and because Peloton encourages such acts resulting in direct patent infringement, by, *inter alia*, training, promotion, and/or sales of the Accused Streaming Services to Peloton customers including, but not limited to, end-users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms for their use of adaptive-rate content streaming as claimed in the '555 Patent.  *See, e.g.*, Exhibit 13 (answering questions such as, "Which Fire TV models are compatible with the Peloton App?" and "Will I be able to cast a class from my Peloton Bike, Tread or iOS/Android app to my Fire TV?") (last visited September 4, 2020).

115.    On information and belief, Peloton intends to, and continues to intend to, indirectly infringe the '555 Patent through inducement of the sale and use of the Accused Streaming Services.

116.    Adaptive bitrate streaming is a well-defined field of technology with only a few major developers, including Apple, Microsoft, Adobe and DISH since its acquisition and continuing development of MOVE's patent portfolio.  On information and belief, as a provider of streamed

content, Peloton would have monitored developments relating to adaptive-rate content streaming technology, including DISH's ABR technology, and knew, or at the very least, should have known, about the issuance of the '555 Patent.

117.   On information and belief, despite knowing that its actions constituted induced infringement of the '555 Patent and/or despite knowing that there was a high likelihood that its actions constituted induced infringement of the patent, Peloton nevertheless continued its infringing actions, and continues to make, use, and sell, the Accused Streaming Services.

118.   Peloton continues to provide the Accused Streaming Services with full knowledge and disregard of the ABR Patents, including the '555 Patent.

119.   Peloton's acts of induced infringement have injured and damaged DISH and will continue to injure and damage DISH.

120.   Peloton's actions have caused DISH to suffer irreparable harm resulting from the loss of its lawful patent rights and the loss of its ability to exclude others from the market.   Upon information and belief, Peloton will continue these infringing acts unless enjoined by this Court.

**INDIRECT INFRINGEMENT BY CONTRIBUTORY INFRINGEMENT**

121.   DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–120 of the Complaint as if fully set forth herein.

122.   Peloton is liable for contributory infringement of the '555 Patent under 35 U.S.C § 271(c) by having sold or offered to sell, and continuing to sell or offer for sale the Accused Streaming Services within the United States because the Accused Streaming Services constitute a material part of the invention embodied in the '555 Patent, which Peloton knows to be especially made and/or especially adapted for use in infringement of the '555 Patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

123.    On information and belief, Peloton is liable for contributory infringement by having knowledge of the '555 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '555 Patent by its customers, including users and subscribers, who use the Accused Streaming Services.

124.    Specifically, Peloton contributes to infringement of the '555 Patent by, *inter alia*, promotion, and/or sales of the infringing Accused Streaming Services to Peloton's customers, including users and subscribers, for their use of adaptive-rate content streaming as claimed in the '555 Patent.  Those customers directly infringe the '555 Patent by using the Accused Streaming Services.

125.    For example, Peloton is liable for contributory infringement by knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, Peloton customers, including users and subscribers, to directly infringe the '555 Patent by using the Accused Streaming Services in the United States.

126.    Adaptive bitrate streaming is a well-defined field of technology with only a few major developers, including Apple, Microsoft, Adobe and DISH since its acquisition and continuing development of MOVE's patent portfolio.  On information and belief, as a provider of streamed content, Peloton would have monitored developments relating to adaptive-rate content streaming technology, including DISH's ABR technology, and knew, or at the very least, should have known, about the issuance of the '555 Patent and that the Accused Streaming Services were especially made and/or especially adapted for use in infringement of the '555 Patent and were not a staple article or commodity of commerce suitable for substantial non-infringing use.

127.    Peloton continues to provide the Accused Streaming Services with full knowledge and disregard of the ABR Patents, including the '555 Patent.

128.    Peloton's past and ongoing infringement of the '555 Patent has and will continue to irreparably harm DISH.

129.    Peloton's past and ongoing infringement of the '555 Patent has and will continue to cause DISH damages.

130.    DISH is asserting claims 10 and 26 of the '555 Patent and some or all of the dependents to those claims.

## COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 10,757,156

### DIRECT INFRINGEMENT

131.    DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–130 of the Complaint as if fully set forth herein.

132.    On information and belief, Peloton directly infringes, literally and/or under the doctrine of equivalents, at least claim 1 of the '156 Patent, which recites:

> An apparatus for rendering a video that is adaptively received as a digital stream from a video server over a network, the apparatus comprising;
>
> a media player operating on the apparatus, wherein the media player is configured to stream the video from the video server via at least one transmission control protocol (TCP) connection over the network, wherein the video server stores multiple different copies of the video encoded at different bit rates as multiple sets of streamlets, wherein each of the streamlets yields a different portion of the video on playback, wherein the streamlets across the different copies yield the same portions of the video on playback, and wherein the streamlets in the different copies are aligned in time such that the streamlets that play back the same portion of the video for the different copies each begin at the same playback time in relation to the beginning of the video, and wherein the media player streams the video by:
>
> requesting sequential streamlets of one of the copies from the video server according to the playback times of the streamlets by transmitting hypertext transport protocol (HTTP) GET requests that identify the selected streamlets stored by the video server, wherein the sequential streamlets are selected by the media player from the based upon successive determinations to shift the playback quality to a higher or lower quality one of the different copies of the video;

repeatedly generating, by the media player, a factor relating to the performance of the network that is indicative of an ability to sustain the streaming of the video;

adapting the successive determinations to shift the playback quality based on the factor to achieve continuous playback of the video using the streamlets of the highest quality copy of the video that is determined to be sustainable at that time; and

presenting the video for playback by providing the requested streamlets in order of ascending start time.

133.    The Accused Streaming Services receive segments of selected video program for playback of programming over a network connection.  The Accused Streaming Services adapt their requests for segments from a set of segments with the same content but varying quality based upon the quality of the network connection.  Exhibit D-1 to this Complaint is a claim chart with a more detailed infringement analysis of the Accused Streaming Services.[4]

134.    On information and belief, Peloton possesses knowledge of, and is aware of, the '156 Patent, or became aware of this patent at the time of filing this lawsuit.

135.    Peloton's acts of infringement have injured and damaged DISH and will continue to injure and damage DISH.

136.    Peloton's actions have caused DISH to suffer irreparable harm resulting from the loss of its lawful patent rights and the loss of its ability to exclude others from the market.  Upon information and belief, Peloton will continue these infringing acts unless enjoined by this court.

## INDIRECT INFRINGEMENT

137.    DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–136 of the Complaint as if fully set forth herein.

---

[4] DISH notes that Exhibit D-1 and Exhibits A-1, B-1, C-1, *see supra*, and E-1, *see infra*, are based exclusively on publicly available information, and without the benefit of any Court claim construction.  Accordingly, for each Count below, DISH reserves the right to supplement, amend or modify the analysis as warranted in light of additional facts, claim construction, or other developments.

138.    On information and belief, Peloton indirectly infringes, literally and/or under the doctrine of equivalents, at least claim 1 of the '156 Patent, which recites:

> An apparatus for rendering a video that is adaptively received as a digital stream from a video server over a network, the apparatus comprising;
>
> a media player operating on the apparatus, wherein the media player is configured to stream the video from the video server via at least one transmission control protocol (TCP) connection over the network, wherein the video server stores multiple different copies of the video encoded at different bit rates as multiple sets of streamlets, wherein each of the streamlets yields a different portion of the video on playback, wherein the streamlets across the different copies yield the same portions of the video on playback, and wherein the streamlets in the different copies are aligned in time such that the streamlets that play back the same portion of the video for the different copies each begin at the same playback time in relation to the beginning of the video, and wherein the media player streams the video by:
>
> requesting sequential streamlets of one of the copies from the video server according to the playback times of the streamlets by transmitting hypertext transport protocol (HTTP) GET requests that identify the selected streamlets stored by the video server, wherein the sequential streamlets are selected by the media player from the based upon successive determinations to shift the playback quality to a higher or lower quality one of the different copies of the video;
>
> repeatedly generating, by the media player, a factor relating to the performance of the network that is indicative of an ability to sustain the streaming of the video;
>
> adapting the successive determinations to shift the playback quality based on the factor to achieve continuous playback of the video using the streamlets of the highest quality copy of the video that is determined to be sustainable at that time; and
>
> presenting the video for playback by providing the requested streamlets in order of ascending start time.

139.    The Accused Streaming Services receive segments of a selected video program for playback of programming over a network connection.  The Accused Streaming Services adapt requests for segments from a set of segments with the same content but varying quality based upon the quality of the network connection.  Exhibit D-1 to this Complaint is a claim chart with a more detailed infringement analysis of the Accused Streaming Services.

## INDIRECT INFRINGEMENT BY INDUCEMENT

140.   DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–139 of the Complaint as if fully set forth herein.

141.   On information and belief, Peloton is liable for inducing infringement of the '156 Patent under 35 U.S.C. § 271(b) by having knowledge of the '156 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '156 Patent, with specific intent, by its customers.

142.   Specifically, Peloton actively induces infringement of the '156 Patent by, *inter alia*, training its customers on the use of the Accused Streaming Services and/or promotion and/or sales of the Accused Streaming Services to Peloton's customers including, but not limited to, end-users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms for implementing adaptive-rate content streaming as claimed in the '156 Patent.

143.   Peloton's customers for the Accused Streaming Services directly infringe the '156 Patent by making, using, selling, and/or offering for sale the Accused Streaming Services.

144.   For example, Peloton actively induces infringement of the '156 Patent, because Peloton has knowledge that end users of the Accused Streaming Services including, but not limited to, users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms, use Peloton's infringing Accused Streaming Services in the United States, and because Peloton encourages such acts resulting in direct patent infringement, by, *inter alia*, training, promotion, and/or sales of the Accused Streaming Services to Peloton customers including, but not limited to, end-users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms for their use of adaptive-rate content streaming as claimed in the '156 Patent.  *See, e.g.*, Exhibit 13 (answering questions such as, "Which Fire TV

models are compatible with the Peloton App?" and "Will I be able to cast a class from my Peloton Bike, Tread or iOS/Android app to my Fire TV?") (last visited September 4, 2020).

145.   On information and belief, Peloton intends to, and continues to intend to, indirectly infringe the '156 Patent through inducement of the sale and use of the Accused Streaming Services.

146.   Adaptive bitrate streaming is a well-defined field of technology with only a few major developers, including Apple, Microsoft, Adobe and DISH since its acquisition and continuing development of MOVE's patent portfolio.  On information and belief, as a provider of streamed content, Peloton would have monitored developments relating to adaptive-rate content streaming technology, including DISH's ABR technology, and knew, or at the very least, should have known, about the issuance of the '156 Patent.

147.   On information and belief, despite knowing that its actions constituted induced infringement of the '156 Patent and/or despite knowing that there was a high likelihood that its actions constituted induced infringement of the patent, Peloton nevertheless continued its infringing actions, and continues to make, use, and sell, the Accused Streaming Services.

148.   Peloton continues to provide the Accused Streaming Services with full knowledge and disregard of the ABR Patents, including the '156 Patent.

149.   Peloton's acts of induced infringement have injured and damaged DISH and will continue to injure and damage DISH.

150.   Peloton's actions have caused DISH to suffer irreparable harm resulting from the loss of its lawful patent rights and the loss of its ability to exclude others from the market.  Upon information and belief, Peloton will continue these infringing acts unless enjoined by this Court.

**INDIRECT INFRINGEMENT BY CONTRIBUTORY INFRINGEMENT**

151.    DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–150 of the Complaint as if fully set forth herein.

152.    Peloton is liable for contributory infringement of the '156 Patent under 35 U.S.C § 271(c) by having sold or offered to sell, and continuing to sell or offer for sale the Accused Streaming Services within the United States because the Accused Streaming Services constitute a material part of the invention embodied in the '156 Patent, which Peloton knows to be especially made and/or especially adapted for use in infringement of the '156 Patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

153.    On information and belief, Peloton is liable for contributory infringement by having knowledge of the '156 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '156 Patent by its customers, including users and subscribers, who use the Accused Streaming Services.

154.    Specifically, Peloton contributes to infringement of the '156 Patent by, *inter alia*, promotion, and/or sales of the infringing Accused Streaming Services to Peloton's customers, including users and subscribers, for their use of adaptive-rate content streaming as claimed in the '156 Patent.  Those customers directly infringe the '156 Patent by using the Accused Streaming Services.

155.    For example, Peloton is liable for contributory infringement by knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, Peloton customers, including users and subscribers, to directly infringe the '156 Patent by using the Accused Streaming Services in the United States.

156.    Adaptive bitrate streaming is a well-defined field of technology with only a few major developers, including Apple, Microsoft, Adobe and DISH since its acquisition and continuing

development of MOVE's patent portfolio.  On information and belief, as a provider of streamed content, Peloton would have monitored developments relating to adaptive-rate content streaming technology, including DISH's ABR technology, and knew, or at the very least, should have known, about the issuance of the '156 Patent and that the Accused Streaming Services were especially made and/or especially adapted for use in infringement of the '156 Patent and were not a staple article or commodity of commerce suitable for substantial non-infringing use.

157.    Peloton continues to provide the Accused Streaming Services with full knowledge and disregard of the ABR Patents, including the '156 Patent.

158.    Peloton's past and ongoing infringement of the '156 Patent has and will continue to irreparably harm DISH.

159.    Peloton's past and ongoing infringement of the '156 Patent has and will continue to cause DISH damages.

160.    DISH is asserting claim 1 of the '156 Patent and some or all of the dependents to that claim.

## COUNT V: INFRINGEMENT OF U.S. PATENT NO. 10,951,680

### DIRECT INFRINGEMENT

161.    DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–160 of the Complaint as if fully set forth herein.

162.    On information and belief, Peloton directly infringes, literally and/or under the doctrine of equivalents, at least claim 14 of the '680 Patent, which recites:

> An end user station to stream a video over a network from a server for playback of the video, the content player device comprising:
>
> a processor;

a digital processing apparatus memory device comprising non-transitory machine-readable instructions that, when executed, cause the processor to:

establish one or more network connections between the end user station and the server, wherein the server is configured to access at least one of a plurality of groups of streamlets;

wherein the video is encoded at a plurality of different bitrates to create a plurality of streams including at least a low quality stream, a medium quality stream, and a high quality stream, each of the low quality stream, the medium quality stream, and the high quality stream comprising a group of streamlets encoded at the same respective one of the different bitrates, each group comprising at least first and second streamlets, each of the streamlets corresponding to a portion of the video;

wherein at least one of the low quality stream, the medium quality stream, and the high quality stream is encoded at a bit rate of no less than 600 kbps; and wherein the first streamlets of each of the low quality stream, the medium quality stream and the high quality stream each has an equal playback duration and each of the first streamlets encodes the same portion of the video at a different one of the different bitrates;

select a specific one of the low quality stream, the medium quality stream, and the high quality stream based upon a determination by the end user station to select a higher or lower bitrate version of the streams;

place at least one virtual timeline request for at least one virtual times based on the selected one of the he low quality stream, the medium quality stream, and the high quality stream; and

receive the at least one virtual timeline.

163.    The Accused Streaming Services receive segments of a selected video program for playback of programming over a network connection.  The Accused Streaming Services adapt requests for segments from a set of segments with the same content but varying quality based upon the quality of the network connection.  Exhibit E-1 to this Complaint is a claim chart with a more detailed infringement analysis of the Accused Streaming Services.[5]

---

[5] DISH notes that Exhibit E-1 and Exhibits A-1, B-1, C-1, and D-1, *see supra*, are based exclusively on publicly available information, and without the benefit of any Court claim construction.  Accordingly, for each Count below, DISH reserves the right to supplement, amend or modify the analysis as warranted in light of additional facts, claim construction, or other developments.

164.    On information and belief, Peloton possesses knowledge of, and is aware of, the '680 Patent, or became aware of this patent at the time of filing this lawsuit.

165.    Peloton's acts of infringement have injured and damaged DISH and will continue to injure and damage DISH.

166.    Peloton's actions have caused DISH to suffer irreparable harm resulting from the loss of its lawful patent rights and the loss of its ability to exclude others from the market.   Upon information and belief, Peloton will continue these infringing acts unless enjoined by this court.

## INDIRECT INFRINGEMENT

167.    DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–166 of the Complaint as if fully set forth herein.

168.    On information and belief, Peloton indirectly infringes, literally and/or under the doctrine of equivalents, at least claim 14 of the '680 Patent, which recites:

> An end user station to stream a video over a network from a server for playback of the video, the content player device comprising:
>
> a processor;
>
> a digital processing apparatus memory device comprising non-transitory machine-readable instructions that, when executed, cause the processor to:
>
> establish one or more network connections between the end user station and the server, wherein the server is configured to access at least one of a plurality of groups of streamlets;
>
> wherein the video is encoded at a plurality of different bitrates to create a plurality of streams including at least a low quality stream, a medium quality stream, and a high quality stream, each of the low quality stream, the medium quality stream, and the high quality stream comprising a group of streamlets encoded at the same respective one of the different bitrates, each group comprising at least first and second streamlets, each of the streamlets corresponding to a portion of the video;
>
> wherein at least one of the low quality stream, the medium quality stream, and the high quality stream is encoded at a bit rate of no less than 600 kbps; and wherein the first streamlets of each of the low quality stream, the medium quality stream and the high quality stream each has an equal playback duration and each of the

first streamlets encodes the same portion of the video at a different one of the different bitrates;

select a specific one of the low quality stream, the medium quality stream, and the high quality stream based upon a determination by the end user station to select a higher or lower bitrate version of the streams;

place at least one virtual timeline request for at least one virtual times based on the selected one of the he low quality stream, the medium quality stream, and the high quality stream; and

receive the at least one virtual timeline.

169.    The Accused Streaming Services receive segments of a selected video program for playback of programming over a network connection.  The Accused Streaming Services adapt requests for segments from a set of segments with the same content but varying quality based upon the quality of the network connection.  Exhibit E-1 to this Complaint is a claim chart with a more detailed infringement analysis of the Accused Streaming Services.

## INDIRECT INFRINGEMENT BY INDUCEMENT

170.    DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–169 of the Complaint as if fully set forth herein.

171.    On information and belief, Peloton is liable for inducing infringement of the '680 Patent under 35 U.S.C. § 271(b) by having knowledge of the '680 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '680 Patent, with specific intent, by its customers.

172.    Specifically, Peloton actively induces infringement of the '680 Patent by, *inter alia*, training its customers on the use of the Accused Streaming Services and/or promotion and/or sales of the Accused Streaming Services to Peloton's customers including, but not limited to, end-users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms for implementing adaptive-rate content streaming as claimed in the '680 Patent.

173.   Peloton's customers for the Accused Streaming Services directly infringe the '680 Patent by making, using, selling, and/or offering for sale the Accused Streaming Services.

174.   For example, Peloton actively induces infringement of the '680 Patent, because Peloton has knowledge that end users of the Accused Streaming Services including, but not limited to, users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms, use Peloton's infringing Accused Streaming Services in the United States, and because Peloton encourages such acts resulting in direct patent infringement, by, *inter alia*, training, promotion, and/or sales of the Accused Streaming Services to Peloton customers including, but not limited to, end-users, subscribers, digital streaming platforms, digital mobile platforms, and digital connected device platforms for their use of adaptive-rate content streaming as claimed in the '680 Patent.  *See, e.g.*, Exhibit 13 (answering questions such as, "Which Fire TV models are compatible with the Peloton App?" and "Will I be able to cast a class from my Peloton Bike, Tread or iOS/Android app to my Fire TV?") (last visited September 4, 2020).

175.   On information and belief, Peloton intends to, and continues to intend to, indirectly infringe the '680 Patent through inducement of the sale and use of the Accused Streaming Services.

176.   Adaptive bitrate streaming is a well-defined field of technology with only a few major developers, including Apple, Microsoft, Adobe and DISH since its acquisition and continuing development of MOVE's patent portfolio.  On information and belief, as a provider of streamed content, Peloton would have monitored developments relating to adaptive-rate content streaming technology, including DISH's ABR technology, and knew, or at the very least, should have known, about the issuance of the '680 Patent.

177.   On information and belief, despite knowing that its actions constituted induced infringement of the '680 Patent and/or despite knowing that there was a high likelihood that its

46

actions constituted induced infringement of the patent, Peloton nevertheless continued its infringing actions, and continues to make, use, and sell, the Accused Streaming Services.

178.    Peloton continues to provide the Accused Streaming Services with full knowledge and disregard of the ABR Patents, including the '680 Patent.

179.    Peloton's acts of induced infringement have injured and damaged DISH and will continue to injure and damage DISH.

180.    Peloton's actions have caused DISH to suffer irreparable harm resulting from the loss of its lawful patent rights and the loss of its ability to exclude others from the market.  Upon information and belief, Peloton will continue these infringing acts unless enjoined by this Court.

**INDIRECT INFRINGEMENT BY CONTRIBUTORY INFRINGEMENT**

181.    DISH re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1–180 of the Complaint as if fully set forth herein.

182.    Peloton is liable for contributory infringement of the '680 Patent under 35 U.S.C § 271(c) by having sold or offered to sell, and continuing to sell or offer for sale the Accused Streaming Services within the United States because the Accused Streaming Services constitute a material part of the invention embodied in the '680 Patent, which Peloton knows to be especially made and/or especially adapted for use in infringement of the '680 Patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

183.    On information and belief, Peloton is liable for contributory infringement by having knowledge of the '680 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '680 Patent by its customers, including users and subscribers, who use the Accused Streaming Services.

184.   Specifically, Peloton contributes to infringement of the '680 Patent by, *inter alia*, promotion, and/or sales of the infringing Accused Streaming Services to Peloton's customers, including users and subscribers, for their use of adaptive-rate content streaming as claimed in the '680 Patent.  Those customers directly infringe the '680 Patent by using the Accused Streaming Services.

185.   For example, Peloton is liable for contributory infringement by knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, Peloton customers, including users and subscribers, to directly infringe the '680 Patent by using the Accused Streaming Services in the United States.

186.   Adaptive bitrate streaming is a well-defined field of technology with only a few major developers, including Apple, Microsoft, Adobe and DISH since its acquisition and continuing development of MOVE's patent portfolio.  On information and belief, as a provider of streamed content, Peloton would have monitored developments relating to adaptive-rate content streaming technology, including DISH's ABR technology, and knew, or at the very least, should have known, about the issuance of the '680 Patent and that the Accused Streaming Services were especially made and/or especially adapted for use in infringement of the '680 Patent and were not a staple article or commodity of commerce suitable for substantial non-infringing use.

187.   Peloton continues to provide the Accused Streaming Services with full knowledge and disregard of the ABR Patents, including the '680 Patent.

188.   Peloton's past and ongoing infringement of the '680 Patent has and will continue to irreparably harm DISH.

189.   Peloton's past and ongoing infringement of the '680 Patent has and will continue to cause DISH damages.

190.    DISH is asserting claims 14 and 28 of the '680 Patent and some or all of the dependents to those claims.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby request a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, DISH respectfully requests that this Court enter:

A.    A judgment in favor of DISH that Peloton has infringed the ABR Patents, directly, jointly, and/or indirectly by way of inducing and/or contributing to the infringement of the ABR Patents;

B.    An order of this Court permanently enjoining Peloton and its officers, directors, agents, affiliates, employees, divisions, branches, subsidiaries, parents, and all others in active concert therewith from infringing, including inducing the infringement of, or contributing to the infringement of, the ABR Patents;

C.    A judgment and order requiring Peloton to pay DISH its damages, costs, expenses, and pre-judgment and post-judgment interest for Peloton's infringement of the ABR Patents, as provided under 35 U.S.C. § 284;

D.    An accounting of lost sales not presented at trial and an award of additional damages for any such lost sales; and

E.    Such other and further relief to which DISH may show itself to be entitled and/or as the Court may deem just and proper.

Dated: April 13, 2021

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By:  */s/  Kurt Pankratz*

G. Hopkins Guy, III
hop.guy@bakerbotts.com
1001 Page Mill Road
Building One, Suite 200
Palo Alto, CA 94304
Telephone: 650.739.7500
Facsimile: 650.739.7699

Kurt Pankratz
kurt.pankratz@bakerbotts.com
2001 Ross Ave., Suite 900
Dallas, TX  75201
(214) 953-6584
Telephone: 214.953.6584
Facsimile: 214.661.4584

Ali Dhanani
ali.dhanani@bakerbotts.com
One Shell Plaza
910 Louisiana St.,
Houston, TX 77002
Telephone: 281.250.2294
Facsimile: 713.229.2808

Jamie R. Lynn
jamie.lynn@bakerbotts.com
700 K Street, N.W.
Washington, DC 20004
Telephone: 202.639.7700
Facsimile: 202.639.7890

*Attorneys for Plaintiffs,*
*DISH TECHNOLOGIES L.L.C.*
*and SLING TV L.L.C.*

## <u>CERTIFICATE OF SERVICE</u>

I, Kurt Pankratz, hereby certify that the foregoing DEFENDANT PELOTON INTERACTIVE, INC. was served by mail on the following:

> Corporation Service Company
> 251 Little Falls Drive
> Wilmington, Delaware 19808

April 13, 2021                                   By: _/s/ Kurt Pankratz_
                                                 Kurt Pankratz
                                                 _Attorneys for Plaintiffs_